MEIER & LOCKWOOD CORPORATION, Respondent, v. DAKOTA LIVE STOCK INVESTMENT CO. et al, Appellants, and

L. P. VERMILYEA, Respondent, v. DAKOTA LIVE STOCK & INVESTMENT CO. et al, Appellants, and

GEORGE SCHILDER, Respondent, v. DAKOTA LIVE STOCK & INVESTMENT CO. et al, Appellants, and

C. H. PECK, Respondent, v. DAKOTA LIVESTOCK & INVESTMENT CO. et al, Appellants.

(193 N. W. 138.)

(File-Nos. 5139, 5140, 5141, 5142.   Opinion filed April 3, 1923.)

1. Negligence—Fires—Pleadings—Complaint Held to Charge Negligence in Using Hay Camp Cook Stove Causing Fire.

A complaint alleging negligence in maintaining a cook car containing a stove with a pipe seven feet long in a hayfield in a dry season when hay was allowed to accumulate near the car and to cover the fire guards so as to permit fire to escape and spread, and maintaining the car under such conditions was dangerous, and that by reason thereof fire was negligently permitted to escape, held to state a cause for negligence within Rev. Code 1919, Sec. 801.

2. Negligence—Jury—Questions of Fact—Question of Negligence in Using Hay Camp Cook Stove Causing Fire Held for Jury.

Evidence held sufficient for the jury on question of defendant's knowledge of the dangerous character of his hay camp cook stove and the camp, and also of his negligence in causing a fire.

3. Negligence—Evidence—Circumstantial Evidence of Origin of Fire Sufficient.

Where the origin of a fire must be determined by circumstantial evidence, such circumstances must be shown as will

produce conviction to a reasonable certainty on an unpreju-
diced mind, and each fact, from start to finish, must by reason-
able inference connect with the next fact in line.

4.    Negligence—Evidence—Fires—Evidence Held to Show Negligence
       in Using Hay Camp Cook Stove Causing Fire.
        Circumstantial evidence held sufficient to sustain finding that
    fire was started by a spark from a cook stove in a cook car at a
    hay camp inadequately protected by fire guards.

5.    Negligence — Corporations — Principal and Agent — Corporation
       Lending Money to Operator of Hay Camp Not Chargeable With
       His Negligence Causing Fire.
        A live stock and investment company, loaning money to
    defendant to operate a hay camp and leasing him all the live
    stock and machinery necessary, except a cook car, although it
    kept books for the operator and received his money for the
    hay, held not responsible for operator s negligence in permitting
    fire to spread from camp.

Appeal from Circuit Court, Faulk County; Hon. J. H. Bot-
tum, Judge.

Separate actions by the Meier & Lockwood Corporation, L.
P. Vermilyea, George Schilder, and C. H. Peck against the Da-
kota Live Stock and Investment Company, James Lemmon and
George Lemmon. From separate judgments for plaintiffs, de-
fendants appeal. Affirmed as to defendant George Lemmon, and
reversed and vacated as to the other defendants.

*Jacobs & Byrne,* of Faulkton, and *P. J. Tscharner,* of Rapid
City, for Appellants.

*F. E. Snider,* of Faulkton, for Respondents.

(1)    To point one of the opinion, Appellant cited: Van Dyke
v. Grand Trunk Railway Company (Vt.), 1913 Ann. Cas. 640;
Hall v. Nor. Pac. Ry., 16 N. D. 60, 111 N. W. 609, 14 Ann. Cas.
960; Mitchell v. Prage (Mich.), 57 N. W. 1096; Coal Bluff Min.
Co. v. Wattes, 6 Ind. App. 347, 33 N. E. 662; Jeffersonville, M.
& I. R. Co. v. Dunlap, 29 Ind. 426; Ohio & M. R. Co. v. Engrer,
4 Ind. App. 261, 30 N. E. 924; Griggs v. St. Paul, 9 Minn. 246,
Gil. 231; Woodward v. Oregon R. & Nav. Co., 18 Ore. 289, 22
Pac. 1076; Griggs v. St. Paul, 9 Minn. 246, Gil. 231; Missouri
P. R. Co. v. Hennessey, 75 Tex. 155, 12 S. W. 608; King v.
Oregon Short Line R. Co. (Idaho), 59 L. R. A. 214; Tarrance v.
Chapman (Ala.), 71 So. 707; Soule v. Weatherby et al, 38 Utah
590, 118 Pac. 833, 30 Ann. Cas. 75.

(2) To point two, Appellant cited: Balding v. Andrews (N. D.), 96 N. W. 305; Sheldon v. Ry. Co., 29 Barb. 228; Longbaugh v. Ry. Co., 9 Nev. 296; Smith v. Ry. Co., 37 Mo. 295; Omaha Ry. Co. v. Clark (Neb.), 53 N. W. 481; White v. Ry. Co., 1 S. D. 330, 47 N. W. 146, 9 L. R. A. 824; Sheldon v. Ry. Co., 29 Barb. 228; Wright v. Sioux Falls Traction System, 28 S. D. 384; Minneapolis Sash & Door Co. v. Great Northern Ry. Co. (Minn.), 86 N. W. 451.

Respondent cited: 11 R. C. L. 941.

(3) To point three, Appellant cited: White v. C. M. & St. P. Ry. Co., 1 S. D. 330; Kenny v. R. R. Company, 70 Mo. 343, 80 Mo. 573; Sheldon v. R. R. Co., 14 N. Y. 218; Campbell v. Mo. Pocific R. Co. (Mo.), 25 L. R. A. 177; L. & N. Ry. v. Brewer (Ky.), 186 S. W. 166; Swenson v. Earlandson et al, 90 N. W. 534; Clark v. Grand Trunk Western Railway, 149 Mich. 300, 12 Ann. Cas. 559; Finkelston v. C. M. & St. P. Ry., 94 Wis. 270; 68 N. W. 1005; 2 Abbott Trial Evidence 1554 ,3d Ed.); Pryer v. Murname, 82 Conn. 48; Gibbons v. R. R. Co., 59 Wis. 335, 17 N. W. 134; Painter v. C. B. & Q. R. Company (Neb.), 140 N. W. 787; Baird v. Chambers (N. D.), 109 N. W. 61, 6 L. R. A. (N. S.) 882; 20 R. C. L. 181; 20 R. C. L. 190; Matton v. Fremont R. Co., 6 S. D. 301; Railroad Co. v. Spenn, 87 Ind. 322; Haugen v. Chicago M. & St. P. Ry. Co., 3 S. D. 402; 20 Cyc. 595.

SHERWOOD, J. From the 9th day of August until about the 1st of October, 1919, defendant, George Lemmon, was operating a hay camp located about the center of the southwest quarter of section 13, township 119, range 71, which, with two other quarters near by, he held under a lease for haying purposes.

The crew consisted of from 15 to 25 people, increasing as the work progressed.

The land where the hay camp was located was mowed over, then from four to six furrows were plowed around a circular plot of prairie sod, from 100 to 170 feet in diameter. Around the outside of these furrows, and about 25 feet from them, six or eight other furrows were plowed clear around the first, leaving two irregular circles of mowed prairie, surrounded by these narrow fire guards.

There was no other fire protection, except these two fire guards, around the camp, and a fire drag and plow, and there was nothing to prevent the fire from spreading and running for miles, in any direction, if it passed these two fire guards.

About 25 feet from the inside of the inner circle of plowing, and about the center of the southeast quarter of the circle, there was a cook car about 14 feet long and 7 feet high from floor to ceiling. This car was about 3½ feet above the ground, and contained, among other things, a six-hole cookstove connected out through the roof by an ordinary stove pipe, extending straight up from the stove through the roof, and about a foot or a foot and a half above the cook car roof. This pipe consisted of three lengths of stovepipe, was about 6 feet long, and there was a damper in the first length of the pipe. The stove appears to have been an ordinary soft coal burner, and the fuel used soft coal. There was no covering, screen, or other protection in or on top of the pipe to prevent sparks from escaping.

Inside the inner circle of plowing, and not far from the cook car, was a bunkhouse, sheep wagon, some sleeping tents used by the crew as sleeping accommodations, and for other ordinary purposes; also tools and machinery usually found with such an outfit.

On the 18th day of September, 1919, between 12:30 and 1 o'clock in the afternoon, a fire started either within the inner circle of plowing, about 100 feet south and west of the cook car, or just outside the outer circle of plowing, and directly west and a little north of the cook car. No one saw the fire start, and there is no evidence in the record that any sparks had been seen coming from the pipe on the cook car at any time. No work was being done at the hay camp at the time the fire occurred, either because they were out of gasoline for operating the baling machine, or because the wind was too high to work at the time.

The cook, her sister, four men belonging to the crew, and Mr. George Lemmon were all the people at the camp from about 10 o'clock that morning until after the fire occurred. The rest of the crew were either in Millard or Faulkton.

No part of the land inside or outside of the furrows surrounding the hay camp, had been burned off before the fire occurred, and the grass and stubble at and for a long distance around the camp was very dry. There had been no rain for

nearly two weeks prior to that time, and the wind on that day was blowing hard both before and after the fire.

The record discloses that there was another hay camp about 3 miles west of Mr. Lemmon's hay camp, and that a farmer lived 1½ miles southeast of his camp, but no persons, except Mr. Lemmon, his four men above referred to, and the woman cook and her sister, were shown to be at or about the camp from 11 o'clock that morning until some time after the fire had occurred. The general direction of the fire was to the southeast, and it burned a strip nearly 2 miles wide and about 4 or 5 miles long.

At the point where the fire was stopped its western edge was nearly 2 miles east of the place where it began. The fire burned nearly south from the hay camp, until it reached the south line of section 11, and then burned a little west, but did not reach the west side of section 24. On the east side it crossed the south line of section 11, at about the quarter corner, and then burned nearly southeast to about the quarter corner on the west side of section 20, in that township. Otherwise the line of the fire was to the southeast, as before indicated.

All meals for the help were cooked and served in the cook car, and at the time of the fire about 23 people were regularly employed in running the hay camp.

At that time there were also kept at the hay camp about 30 head of horses, and the necessary wagons, water tank, buckers, and other machinery necessary to operate the camp, and there was some hay on the wagons and in the feed racks. This fire occurred on Thursday, September 18, 1919.

Plaintiff further claimed, and offered testimony tending to prove, that the horses on the Sunday night before the fire occurred, and for several weeks prior to that time, had been kept and fed either just inside the inner circle of plowing, at the south end, or just south of that, inside the next circle of plowing, and that the wagons were drawn in there with hay on them, and the horses were either tied to those wagons or to a hayrack standing on or near the inner circle of breaking, and kept and fed there. That hay was sometimes hauled in, in large bucker loads, across the two fire guards, and that on the south side for quite a width hay and manure were scattered over both fire guards, and clear into the inside of the inner circle of plowing, and clear over the

outer fire guard to the stubble land beyond, and was left there four or five inches deep, and that the camp had been kept in that condition for quite a period of time at and before the fire occurred, and that the fire spread from inside these fire guards to the outside stubble over this loose hay and manure, across the fire guards, and thence to plaintiff's land.

Plaintiff further offered proof tending to show that a witness some distance from the fire saw it start very close to the cook shack, and that a few minutes after the fire actually started he reached the hay camp, and found the fire burning inside the inner circle of plowing, and near the south end of it, and saw a wagon rack near the south side of the inner circle of plowing.

Plaintiff offered further testimony to show that charred pieces of the burned hayrack were found that evening at the south end of the hay camp, and inside the inner circle of plowing, and that about 7 o'clock that evening George Lemmon, one of the defendants, pointed out the place where the fire started, and the place so pointed out by Lemmon was about 50 feet south and 50 feet west of the cook car, and inside the inner fire guard. Mr. Lemmon denies pointing out a place inside the inner fire guard as the place where the fire started.

Plaintiff further offered proof tending to show that the wind was blowing from the northeast in the forenoon, and that between 12 and 1 o'clock it shifted from the northeast into the northwest.

Defendant offered proof tending to show that the feed racks on the day of the fire and for several weeks prior thereto were located just outside the outer circle of plowing, and about 195 feet west and a little north of the cook car; that the wind was blowing strong from the northwest all day; that none of the crew saw the fire start; that after dinner, and about 1 o'clock, and when the fire had burned over only a very small space, a few feet square, the fire was then burning in an open space between the horses, which were tied to two wagons, and one hayrack, and appeared to have started right among the horses and just outside the outer circle of plowing; that neither the defendant Lemmon nor any persons in his crew had any knowledge as to how the fire started; that no persons had been near the place where the fire started for more than an hour and a half before it was discovered; that there was no hay either on wagons, or in bucker

loads, or otherwise, inside the outer fire guard, and there had not been any there for many weeks, and the horses had not been fed inside the inner or outer fire guards for several weeks before the fire, and there was no hay or manure scattered across the fire guards, and leading to the burned grass on the outside; that the fire crossed the outer and inner fire guards by reason of a rack being tipped when they were attempting to turn the horses loose, and some hay that was on fire on the rack blowing across the fire guards and setting the stubble in the inner circle on fire.

It is undisputed that the fire started in one of these two places, either about 195 feet west and a little north of the cook car, and just outside of the outer circle of plowing, or about 50 feet south and 50 feet west of the cook car, and just inside the inner circle of plowing; and it is undisputed that the hay stubble was burned off clear across both circles of plowing on the south side, and nearly up to the cook car, and the burned area extended from the south end of this camp to plaintiff's land, and that plaintiff's land was burned over, and quite a large amount of fencing and standing grass destroyed.

The jury found a verdict for plaintiff, and defendant has appealed.

Plaintiff sets forth two causes of action in his complaint:

[1]   First:   Negligence in operating and maintaining a cook car, where meals were cooked and served for about 25 people, on a stove with a pipe not over 7 feet long, situated in a hayfield, in a very dry time in September, when hay and other combustible material were allowed to accumulate in close proximity to the car, and to cover the fire guards several inches deep so as to permit the fire to escape and spread to plaintiff's land, and alleges that the maintaining of such a cook car, under such conditions, was extremely dangerous, and a fire could easily spread therefrom, and that by reason thereof the fire was negligently permitted to escape from the cook car, and did so escape causing the fire.

Second:   That the fire so started was negligently permitted to escape by reason of the hay spread across the fire guards, and thus did reach plaintiff's land and cause his damage. .

We think the complaint states a cause of action, the gist of which was negligence, in using improper appliances, defectively

equipped, at a time, place, and under circumstances rendering them dangerous, and in failing to observe proper precautions, under the circumstances alleged.

Section 801, R. C. 1919, provides:

"Everyone is responsible not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself."

"Under almost all circumstances, however, there is great danger and a commensurate duty of care in respect of such instrumentalities as explosives, electricity, fires, and firearms." 20 R. C. L., p. 52, § 48.

"It may be stated, as a general principle of law, that one who has in his possession, or under his control, an instrumentality, exceptionally dangerous in character, is bound to take exceptional precaution to prevent an injury being done thereby. * * * A higher degree of care and vigilance is required in dealing with a dangerous agency than in the ordinary affairs of life or business, which involve little or no risk of injury to persons·or property." 20 R. C. L., p. 51, § 47.

"The more imminent the danger the higher the degree of care." 20 R. C. L., p. 25, § 18.

The demurrer to the introduction of any evidence was therefore properly overruled, and upon the evidence introduced the motion to direct a verdict for defendant was properly denied.

[2] It seems clear that the use of a cookstove in a hayfield, where meals for about 25 men were to be cooked and served three times each day, on a stove with so short a pipe, unprotected in any way, which was to be used at a time of year when everything was exceedingly dry and inflammable, and was being so used on a windy day to cook hot meals, under all the circumstances here shown was in itself evidence properly submitted to a jury on the question of negligence.

And, while there was no evidence showing that sparks had been seen at any time to issue from the chimney, we think there was abundant facts proved to carry the case to the jury, both on the question of defendant's knowledge of the dangerous character of his stove and camp, and also his negligence. Gates v. C., M.

& St. P. Ry. Co., 4 S. D. 433, 57 N. W. 200; John Moodie Dry Goods Co. v. Gilruth, 35 S. D. 567, 153 N. W. 383; White v. C., M. & St. P. Ry. Co., 1 S. D. 326, 47 N. W. 146, 9 L. R. A. 824; Patterson v. Brewing Co., 16 S. D. 33, 91 N. W. 336; Waterhouse v. Brewing Co., 16 S. D. 592, 94 N. W. 587.

In Huffman v. Bosworth, 25 N. D. 22, 140 N. W. 672, the Supreme Court of North Dakota said:

"Defendants were bound to know that live coals left in close proximity to dry prairie grass on a windy day constituted a highly dangerous agency, and the law exacted of them a high degree of care under such conditions."

It was said by this court, in Kelsey v. C. & N. W. Ry. Co., 1 S. D. 80, 45 N. W. 204:

"There was no evidence that the locomotive engine attached to the freight train was emitting sparks at the time it passed, or that coals or hot cinders were thrown from it, or that any agent, employe, or other person working for or engaged by the defendant set the fire. The only proof of the origin of the fire is purely circumstantial, and rests upon the fact that a fire started at or near the track within about 10 minutes after a freight train had passed. There was no eyewitness to the ignition of the dry grass, by sparks or otherwise, from the defendant's engine, but it is claimed that this circumstance points to and establishes that fact. There being no counter theory offered by defendant, this may be a reasonable inference or presumption that the fire originated from the sparks or fire of the passing train."

In this case there is no other theory offered by the defendant as to how this fire started. No other fire was known to be about the camp, or within at least a mile and a half of it, at the time this fire started. No person had been nearer either of the places where the fire was said to have started than the cook shack for an hour or more before the fire was discovered.

As was aptly said in the case of Finkelston v. C., M. & St. P. Ry. Co., 94 Wis. 270, 68 N. W. 1005:

"Obviously it is no objection that the origin of the fire was not established by direct evidence."

"If such an occurrence is within reason, then it was a question for the jury to say whether the fire was so caused or not."

[3]   It seems to be the rule that, under circumstances where the origin of a fire must be determined by circumstantial evidence, such circumstances must be shown as will produce conviction to a reasonable certainty on an unprejudiced mind, and that each fact, from start to finish, shall by reasonable inference connect with the next fact in the line.  Finkelston v. C., M. & St. P. Ry. Co., 94 Wis. 270, 68 N. W. 1005.

Testing this case by this rule, we have the following facts:

[4]   There was only one fire within a mile and a half of the cook car.  There was a hot fire in the cookstove in the cook car at the time the fire started, about 100 feet away.  There was no spark arrester or anything to prevent sparks escaping from the cookstove.  The chimney to the cookstove was a straight pipe not over 6 feet high.  The fire probably started within from 75 to 125 feet of the cook car.  At the time the fire started or just before, the wind was in the right direction to carry cinders or sparks from the cookstove to the place where the fire started.  No other cause than a spark from this cookstove is known which could have caused the fire.  The stubble and hay were quite close to the cook car, and were very dry and in a highly inflammable condition.  The high wind would naturally ignite sparks.  It is probable that a fresh fire was started to get the dinner, because the day was hot and no other reason for building a fire than the getting of the noon meal is suggested.

It seems clear that each fact, from start to finish, in this chain of evidence, is such that by reasonable inference it is connected with the next fact, and that the origin of the fire might be established to a reasonable certainty in the mind of any unprejudiced person, and the natural and reasonable conclusion would be that the fire was started by a spark from the cookstove.

It is true that there was a sharp and direct conflict in the evidence as to just the place where the fire started, and there is a direct conflict in the evidence as to whether there was hay and other combustible substances scattered over the fire guards leading from the stubble on the inner side to the stubble on the outer side of the fire guards, which would permit the fire's escape, but there is no dispute but what the fire burned on both sides of the fire guards that day from a point a short distance south of the

cook shack, in a continuous line across both fire guards south and southeast to plaintiff's land.

It was stipulated that George Lemmon was in charge of this hay camp.

The jury found for the plaintiff on all the issues. There was abundant evidence to sustain such finding, as far as the defendant George Lemmon is concerned, and the verdict of the jury and order denying new trial as to George Lemmon must be sustained.

[5] Defendants strenuously contend that there was no evidence to connect any of the defendants with the setting of this fire.

It is clearly shown by the undisputed evidence that neither of the defendants Dakota Live Stock & Investment Company, a corporation, nor the defendant James Lemmon, either owned, controlled or in any way managed this camp.

It is true that the Dakota Live Stock & Investment Company loaned the money to George Lemmon to lease the three quarter sections of land used by him for haying purposes. It also leased to him, for a consideration of $1,000, practically all the live stock and machinery necessary to operate the camp, except the cook car and furniture, which is shown to be the property of George Lemmon. This corporation also kept the books for George Lemmon, and received the money from the railroad company for the hay George Lemmon sold them, but it clearly appears that George Lemmon determined at what price the hay should be sold, to whom, and when it should be sold, and that he had the sole management of the camp, and received the entire profits therefrom, and repaid to said corporation the money loaned him for obtaining the lease, paying the men, and operating the camp, together with 10 per cent interest on each sum advanced from the time it was advanced until settlement was made, and such advances and repayments were made pursuant to a written contract between them. It is neither shown or claimed that the $1,000 received as rent of the tools and machinery was more than a reasonable compensation for their use and the bookkeeping done.

George Lemmon was not a stockholder in the Dakota Live Stock & Investment Company at any time, but had at times been employed by the company, but was not in its employ in operating this hay camp or during the time he operated the same.

For these reasons, any judgments or orders against the defendant Dakota Live Stock & Investment Company, a corporation, and the defendant James Lemmon, or either of them, in any of the above cases, must be vacated and set aside.

We have carefully examined each of the other objections raised by defendants, and they are without merit.

The verdicts of the jury, order denying new trial, and the judgments against George Lemmon are sustained.

Judgment for costs in favor of plaintiff and respondent, and against George Lemmon, will be entered in each action.

Note—Reported in 193 N. W. 138. See American Key-Numbered Digest, (1) Negligence, Key-No. 111(1), 29 Cyc. 565, 570; (2) Negligence, Key-No. 136(17), 29 Cyc. 461; (3) Negligence, Key-No. 134(2), 29 Cyc. 636; (4) Negligence, Key-No. 134(2), 29 Cyc. 625; (5) Negligence, Key-No. 26, 29 Cyc. 477.

On liability for setting, upon ones own premises, fire which spreads to the property of others, see notes in 21 L. R. A. 255 and 36 L. R. A. (N. S.) 194.

On liability for fires set by sparks from chimney, see note in 32 L. R. A. (N. S.) 1003.